## MILAM COUNTY v. R. P. ROBERTSON AND OTHERS.

1. The act of August 30th, 1856, (Paschal's Digest, Art. 3470,) providing that limitation shall not run in favor of settlers on school lands, was probably designed to deter persons from settling on such lands, and was of itself sufficient to put all settlers on inquiry.

2. If the act of February 10th, 1852, (Paschal's Digest, Art. 4562,) requiring the field notes of all prior surveys to be returned to the General Land Office by the thirty-first of August, 1853, had any application to surveys of school lands granted to the several counties by the act of January 26th, 1839, (Paschal's Digest, Art. 3464,) the omission by a county to comply with its provisions was a dereliction of which the State alone could take advantage.

3. The counties are only trustees of the school lands for the use of the people ; and when a county made a survey of its school lands in 1849 upon the domain afterwards comprised within the Mississippi and Pacific railroad reserve, but failed to return the field notes to the General Land Office by the thirty-first of August, 1853, such survey did not become subject to pre-emption when the reserve was opened to location by the act of August 26th, 1856. (Paschal's Digest, Art. 5038.)

4. The fact that four leagues had been surveyed in a single county as school lands must in the nature of things have been too notorious to be ignored by any citizen of the county, and is considered by this court as a cogent circumstance to charge citizens of that county with notice of the locality of such surveys.

APPEAL from Johnson. Tried below before the Hon. John J. Good.

On the twenty-fourth of February, 1866, this action of trespass to try title was instituted by the county of Milam against Rachel P. Robertson and nine other defendants, who were in possession of different parcels of a league of land in Johnson county, patented on the tenth of October, 1860, to Milam county as part of her school lands. The plaintiff prayed judgment for the land and for fifteen thousand dollars damages for timber, &c. By amendment the plaintiff alleged that the defendants, at the time they settled on the land, had actual notice of its prior appropriation by her.

The defendants pleaded a general denial and not guilty, and further alleged that the plaintiff's survey was made long before the passage of the act of February 10, 1852 (Paschal, Art. 4562), and that the field notes thereof were not returned to the General Land Office on or before the thirty-first of August, 1853; that the plaintiff's patent was therefore null and void, was obtained illegally, and was fraudulently issued by the Commissioner of the General Land Office, contrary to law and to the injury of the defendants. Five of the defendants filed other and special answers, setting up pre-emption titles to the parcels claimed by them. A plea of limitation was also filed by the defendants, but no attention seems to have been paid to it in the further progress of the cause. The defendants charged that the plaintiff's patent was a cloud upon their title, and prayed that it he removed and they be quieted in their possession, etc.

The plaintiff denied the allegations of the defendants. And on this state of the pleadings the cause came to a trial at the April term, 1867, of the District Court of Johnson county.

There was no particular contest over the facts of the case. The pre-emptors went into possession in the year 1855, and it appeared that they took all requisite steps to perfect their claims, provided the land was subject to be taken up by them.

The jury found in favor of the pre-emption titles, and for the plaintiff the remainder of the league. The judgment of the court below quieted the possession of the defendants' claiming under the pre-emptions, and gave the plaintiff a writ of possession for the remainder of the league. The plaintiff moved for a new trial, but it was refused, and the county appealed.

One of the defendants, against whom there was judgment below, also brings up the case by writ of error.

Such other facts as are pertinent to the rulings made by this court are stated in the opinion.

*J. G. Terrell* and *H. G. Hendricks*, for the appellant.—We do not think that the act of tenth of February, 1852, requiring the return of field notes to the General Land Office by the thirty-first of August, 1853, applies to land set apart for educational purposes under Article 10 of the State Constitution of 1845, and the laws passed pursuant thereto. (See Art. 10, § 4, Constitution; also, Paschal's Digest, Arts. 3465 and 3466.)

The act of twenty-sixth of January, 1839, section 3, (Paschal, 3466,) requires the surveyor to return a correct description of the land, with the field notes of the survey, to the clerk of the county court, who shall record the same, and forward a transcript to the General Land Office. But there is no law requiring the field notes themselves to be returned to the General Land Office, or requiring patents to issue thereon. It is therefore regarded as a legislative grant, which was complete when the lands subject to location were surveyed, and the field notes returned to and recorded in the county clerk's office. The only object in requiring the clerk to forward a transcript to the General Land Office was to notify that officer, as also subsequent locators, of the appropriation of the land. In this case the defendants had actual notice of the prior appropriation of the lands by Milam county. The court therefore erred in charging the jury that Milam county had forfeited her right to the land by not returning her field notes to the General Land Office by the thirty-first of August, 1853. (Causici v. Lacoste, 20 Tex., 269; Parish v. Weatherford, 19 Tex., 210.)

In support of the position that the counties hold their school lands as grants, in trust for educational purposes, and that the field notes were not required to be returned and filed in the General Land Office, nor patents to issue thereon to the counties, reference is made to the action of the government in her disposition of the university lands, appropriated by the fourth section of said act of twenty-sixth of January, 1839. (See act of thirtieth August,

1856, Paschal's Digest, Arts. 3555 to 3558.)   These lands, when surveyed, were reserved from location or appropriation by other parties.   But patents, under the acts referred to, are to issue to the purchasers in tracts of 160 acres, under provisions of the act.

So the county school lands, secured under the first, second and third sections of the act of twenty-sixth of January, 1839, when surveyed, were reserved from appropriation by others; and though the field notes should be recorded in the county clerk's office, and a transcript forwarded by the clerk to the General Land Office, yet no law has prescribed any time within which it should be done. But as to how the lands shall be disposed of, and to whom patented, if patents are to issue at all, are subjects for subsequent legislation, just as in the disposition of university lands.

*S. P. Donley* and *A. J. Hood*, for the appellees.—The appellant's counsel maintain that neither the act of the tenth of February, 1852, nor any other law, required that field notes to school land should be returned to the Commissioner of the General Land Office.   We maintain the reverse.

In urging this legal proposition for the consideration of this court, appellant's counsel presents the true issue.   And we frankly admit that if the law is with Milam county on this issue, that then all the settlers on the land must vacate their homes; but if the law is with the appellees, as we confidently believe it to be, then the patent of Milam county to the league of land in controversy is a nullity, conferring no legal nor equitable right whatever to any portion of it.

In argument of opposing counsel on this issue, it is broadly asserted that "there is no law requiring the field notes themselves to be returned to the General Land Office, or requiring patents to issue thereon."   Now, it does seem to us that it would indeed be difficult for any one to assume and to assert a legal proposition more wholly unsustained by law than this is.   It seems to us

XXXIII—24

that directly the reverse of this proposition has been most clearly and indubitably established, both by oft repeated legislative enactments and by a number of decisions of this court.

We will first call the attention of this court to some of the legislation of the country, bearing directly on the return of field notes. But before proceeding we wish to state, with due deference to opposing counsel, that we have examined carefully the only decisions cited by the appellant, viz.: Causici v. Lacoste, 20 Texas, 269, and Parish v. Weatherford, 19 Texas, 210; and that we are wholly unable to discover in those decisions anything having the slightest application to the issue.

Then as to the legislation of the country requiring return of field notes and issuance of patents. We include issuance of patents, because, as opposing counsel seem to be aware, if we show that the laws of the country contemplated the issuance of patents on field notes to school lands, we thereby, as a necessary consequence, establish the legal proposition that such field notes had to be returned to the General Land Office. Let us see what the law is, and "was aforetime." Congress, December 22, 1836, passed an act for the establishment of a General Land Office. (See Hartley's Dig., Art. 1783.) Under this act there was to be one Commissioner of the General Land Office, with clerks, etc. Texas was divided into eleven land districts. (See Hartley's Dig., Art. 1793.) Under this system there were eleven land offices. (See Hartley's Dig., Art. 1793.) A surveyor general was to be appointed for each of these districts, whose duty in each district it was, among other things, after returns were made to him, " to examine the field notes and plots of all surveys which have been or may be made within the bounds of his authority, for the purpose of getting a patent for them." (See Hartley's Dig., Art. 1794.) This act further affirmatively declared that " all surveys shall be patented." (See Hartley's Dig., Art. 1798.) This law also provided for the appointment of one register and one receiver for each

land office in the eleven districts, and made it the duty of the register at each of these land offices, after the field notes were examined, etc., by the surveyor general, to make out and transmit to the Commissioner of the General Land Office blank patents for his signature.    (See Hartley's Dig., Art. 1798.)

Congress, June 12, 1837, passed a supplemental act.    This act did not materially change the features of the act to which it was supplementary.    It, however, required that the act of December 22, 1836, should go into operation on the first of October, 1837.    September 30, 1837, Congress passed a joint resolution closing the Land Office.    Congress after this passed the act of December 14, 1837.    (See Hartley's Dig., Art. 1887.)    It was entitled "An act entitled an act to reduce into one act and to amend the several acts relating to the establishment of a General Land Office."    This law in many features changed the former land system.    County surveyors were provided for, who were to keep their offices at the county seats, to have deputies, etc.    Surveyor general and the district land offices were abolished; in lieu, to be but one land office, a general land office, at the seat of government.    Duties of the Commissioner of the General Land Office were enlarged.    Field notes of all surveys were to be returned to the Commissioner of the General Land Office.    (See $ 9 of this act, Hartley's Dig., Art 1845.)    It is there enacted that county surveyors shall examine all field notes of surveys which have been or may hereafter be made in said county, and upon which patents are to be obtained, and shall certify the same under his hand to the Commissioner of the General Land Office."    This act provided for the issuing of patents on all surveys.    Even lands surveyed under orders of survey made before the closing of the land office, in 1855, were to be patented.

We will next call the attention of this court to the two donating acts under which appellant, Milam county, obtained a certificate by virtue of which she, December 23, 1849, had the league of land

in controversy surveyed.   The first of these acts was passed January 26, 1839.   (See Hartley's Dig., Art. 881.)   This act conferred on each county the right to locate for school purposes three leagues of land.   The other act was passed on the fifth of February, 1840.   (See Hartley's Dig., Art. 887.)   This act made the Chief Justice and two commissioners of each county a board of school commissioners, and gave to each county that had taken the benefit of the act of 1839, the right to locate an additional league;. and to such counties as had not located at all—four leagues; thus making it equal between all the counties.

Now, it seems to us an undeniable proposition of law, that, had the legislation of the country on the subject of the return of field notes ended here, and there had been nothing in the donating acts of 1839 and 1840 on that subject, that still the field notes to the league of land in controversy should have been returned to the General Land Office.   Why ?   Because, as above shown, the general laws of the land most positively required that field notes to all surveys should be so returned. There can be no limitation or exception to the scope of a general law, unless the law itself makes the exception.   But apart from the general laws requiring the return of all field notes of all surveys, we submit that the third section of the act of January 26, 1839, did itself contemplate such return.   (See Hartley's Dig., Art 883, latter clause.)   It is there enacted, on the subject of the return of field notes of school land, that " when the lands so surveyed are not situated in the county for which it is surveyed, the description and field notes shall be recorded in the county where it is surveyed, as well as in the county for which it is surveyed, and forwarded to the Land Office, as above described."   We will here remark that at this date there was under the law but one land office, a general land office ; also that the land in controversy was not in Milam county.

But for argument sake, suppose this donating act did not expressly require the return of field notes of school lands to the

General Land Office, would that prove that no such return should be made?   Not at all.   If it did, it would be a very easy task to prove that no field notes whatever had to be returned—for none of the many donating acts, passed before and about this period, expressly provided for such return.   That was done by general laws.

Why it was that the preceding part of the above section required a description of the land, and the field notes to be recorded in the county, and a transcript thereof to be forwarded to the General Land Office is not very apparent.   It was probably merely intended as a means of apprising that officer of the fact that the county was willing to accept the survey, as made by the surveyor making it.   But after all is said that can be said about the provisions of the donating act of 1839, there are some things that cannot be controverted.   There is certainly nothing in the act of 1839 against the return of the field notes to the General Land Office, and the general laws of the land did positively require such return.   Before Milam county took any steps to secure her school land, the further donating act of February 5, 1840, was passed, donating a right to locate four leagues ; and it was under this act that Milam county did finally have the league of land in controversy surveyed.   Years elapsed, however, before Milam county had the survey, here in litigation made.   In the meantime the return of field notes was the subject of oft repeated legislation.   On the very day of the passage of the act donating four leagues to counties, viz.: February 5, 1840, the Congress of the Republic passed another act bearing on this subject.   (See Hartley's Dig., Art. 1991.)   The first section of this act says " that all surveys heretofore made shall be returned as required by law, and with the government dues paid thereon, to the General Land Office, by the first day of January next; and all surveys hereafter made shall be returned as above, within nine months from the date of the survey, otherwise they shall be null and void, and subject to relocation."

There are other features in the last two named acts, to which we will here call the attention of the court. The first section of the donating act of February 5, 1840, (see Hartley's Dig., Art. 887,) made the chief justice of each county, with two associate justices, school commissioners, whose duty it was to locate the school lands. The second section of the other act, passed on the same day, (see Hartley's Dig., Art. 1992,) provided that chief justices should, as before then, act as receivers. Then the third section of this act, (see Hartley's Dig., Art. 1993,) made it the duty of said receivers to forward all field notes to the Commissioner of the General Land Office, "unless the person interested therein shall prefer to convey the same to the General Land Office." Then the sixth section (see Hartley's Dig., Art. 1996) provides that county surveyors shall examine and certify field notes, and deliver them "to the chief justice, or any person interested therein."

Thus it seems that on the very day, to-wit: on the fifth of February, 1840, that Congress passed the law donating to Milam county the right to locate her four leagues of land, another law was passed, making it the duty of her chief justice to forward to the Commissioner of the General Land Office the field notes to her school land; and that the same act also affirmatively declared that "all surveys hereafter made shall be returned as above, within nine months from the date of the survey, otherwise they shall be null and void, and subject to relocation."

At this period, under the law as it then existed, the surveying was done by deputy surveyors, whose duty it was to make returns of all surveys made by them to the county surveyors. And on the nineteenth of January, 1841, (see Hartley's Dig., Art. 2024,) a law was passed, enacting "That the county surveyors of the various counties be required to forward the field notes of all surveys returned to their offices to the Commissioner of the General Land Office, any law to the contrary notwithstanding."  .

Now we insist that if there had been, prior to this, any law in force exempting field notes of school lands from being returned to the General Land Office as other field notes, that this latter statute would have operated as a repeal of such law. But the truth is, there never was at any time any law exempting field notes of school lands, or any other lands. Even the field notes of university lands had to be so returned; and, in one case at least, where they were not, it was the legislative will of the country that subsequent location should hold. (See Paschal's Dig., Art. 897.) The law also contemplated that patents should issue on university lands.

But, to return: Congress, on the tenth day of December, 1840, (see Hartley's Dig., Art. 2065,) passed a joint resolution, giving twelve months longer for the return of field notes to the General Land Office. On the twenty-seventh of November, 1841, (see Hartley's Dig., Art. 2076,) it was enacted that " the further time of twelve months" be given for return of field notes. Then on the twenty-seventh of December, 1842, (see Hartley's Dig., Art. 2101,) the time for the return of field notes was extended "until the first day of January, one thousand eight hundred and forty-six."

Again, on the twenty-sixth of June, 1845, (see Hartley's Dig., Art. 2154,) the law was extended, requiring the return of field notes, until first of January, 1848.

Afterwards, December 31, 1847, (see Hartley's Dig., Art. 2193,) the time for return of field notes is extended until first day of February, 1850.

Then again, on thirty-first of December, 1849, (see Hartley's Dig., Art. 2223,) the time for return of field notes is extended until first day of January, 1852.

An inspection of these several acts will show that by none of them was repealed the act of February 5, 1840, which declared that " all surveys " that were not returned within nine months

from the date of the survey, "shall be null and void." The act of February 5, 1840, was only extended from time to time. Thus we find, from oft repeated legislation, that it was the determined, settled legislative policy of the country that all field notes that were not returned to the General Land Office should eventually be "null and void."

The league of land in controversy was surveyed on the twenty-third day of December, 1849, but the field notes were never returned to the Commissioner of the General Land Office until the sixteenth day of June, 1858. Between the date of the survey and return of the field notes, to-wit : on the tenth day of February, 1852, an act was passed, as is well known by all familiar with the history of the times, for the express purpose of putting an end to what at one time seemed endless legislation on the subject of the return of field notes.

By the first section of this law, (see Paschal's Dig., Art. 4562,) it was enacted as follows : "The field notes of all surveys made previous to the passage of this act shall be made out and returned in the manner now required by law to the General Land Office, on or before the thirty-first day of August, 1853, or they shall become null and void, and the said surveys shall become vacant land, and be subject to be relocated and surveyed as in other cases, by any persons holding a genuine land certificate, or other legal evidence of claim to land."

Comment on this statute is deemed superfluous. No field notes within the bounds of the State were exempt from its provisions— not even those belonging to minors. "The Legislature had the right so to declare." (See note in Paschal's Dig., No. 1007, page 751, and authorities there cited.)

Appellant's counsel insist, in argument, that the act of February 10, 1852, does not apply to field notes of school land. But they seem to be wholly unable to cite one line of law in support of the proposition. For argument's sake, however, suppose it is

as they would have it.   What then?   In avoiding Scylla, would they not be hopelessly wrecked by Charybdis?   This survey, as before stated, was made December 23, 1849, and never returned until the sixteenth day of June, 1858.   Then if the act of the tenth of February, 1852, does not apply, it cannot be successfully denied but that the act of February 5, 1840, does apply, which declares that " all surveys " made after its passage, and not returned to the General Land Office within nine months from the date of the survey, shall be null and void.   This law, as above stated, was never repealed, only extended from time to time.   And the last extension act (save the act of February 10, 1852,) expired on the first day of January, 1852.   And it has been held by this court that the act of February, 10, 1852, operated in relief of, and rendered valid, surveys and field notes that otherwise would have been forfeited and void under the act of February 5, 1840.   (See Hart v. Gibbons, 14 Tex., 215.)

Hence it seems indubitably true that it is only by the healing operation of the act of February 10, 1852, that surveys made over nine months before the first of January, 1852, and not returned to the General Land Office by that time, are validated.

No one, it seems to us, will pretend to say that the act of February 5, 1840, did not mean what it said—" all surveys." It was passed the very day of the passage of the law which authorized Milam county to locate the four leagues, of which the one in controversy is a part.   It was on the statute books of the country, unrepealed, at the time Milam county located her certificate and had the land surveyed.   Then what possible benefit would it be to appellant's counsel to succeed in that argument?   For if the act of February 10, 1852, does not apply for one purpose it cannot for another, and if it does not apply at all to these field notes, they are still under the act of February 5, 1840, and in the very language of that act, " null and void."

We wish here to notice another point, or rather statement,

made by appellant's counsel. They assume it, in their brief, as a fact proven on the trial, that appellees, at the time of their settlement on the land in 1855, had actual notice that Milam county claimed the land. Now as a law question, we cannot see how either notice or want of notice can have the slightest legal bearing on the issue in this cause. Notice does not affect. (See Jennings v. DeCordova, 20 Tex., 508; Cravens v. Brooks, 17 Tex., 274.)

The question of the non-return of field notes has been several times before this court, and in no case heretofore passed on, within our knowledge, has the court attached the least importance to the question of notice. In determining whether field notes to land are void or valid—and this is the issue, there is no medium ground—what possible light can be thrown on the question by proving that other claimants to the land knew of the existence of the survey and field notes? But, with due respect to opposing counsel, we must be permitted to say that when they assume, as they do, that "in this case defendants had actual notice of the prior appropriation of the land by Milam county," that they make a statement unsustained by the record. It is true that appellant averred actual notice, and on the trial introduced a number of witnesses to prove it, but most signally failed; in fact, proved an entire want of even constructive notice.

The third section of the act of January 26, 1839, (see Hartley's Digest, Art. 883,) positively required that Milam county should have her field notes recorded in both Johnson and Milam counties. Yet she never did, at any time, have them recorded in Johnson county. And she wholly failed to have them recorded in Milam county until the ninth of June, 1858, which was three years after appellees had settled on the land. In this connection we will remark, because it is part of the history of the country, that in December, 1849, the date of appellant's survey, no white man lived west of the Brazos river in the region of these lands.

How then could appellees, at the time of their settlement in 1855, have had notice of appellant's survey? Milam county had neglected to comply with the law. She had neither returned her field notes to the General Land Office nor placed them on record anywhere.

It is true that some of the witnesses disclosed the fact that some time after appellees settled on the land, they found out that Milam county had, at one time, surveyed the land; but the understanding even then was that she had abandoned it. But every witness introduced, who was in the country at the time of settlement, swore positively that nothing was known of the survey of Milam county in 1855, when appellees settled.

So it seems conclusively true that if the question of notice raises equities, such equities are all in favor of the appellees.

Appellant's counsel, in their argument, desire this court to regard the certificate, survey and field notes of Milam county as " a legislative grant." This cannot be. And we would not notice this branch of their argument but for the seeming seriousness with which it is made.

Appellant's counsel, in making this argument, contradict themselves. If the certificate, survey and field notes of Milam county constitute " a legislative grant," why did they in the court below introduce in evidence, and rely on their patent instead of their certificate and field notes, as title to the land?

To regard the certificate procured by Milam county, under the acts of 1839 and 1840, and its location and survey, as a legislative grant, vesting the absolute fee, would be in contravention of our whole land system, repugnant to oft repeated legislation on the subject of surveys, field notes and patents. It would also be in direct conflict with many uniform decisions of this court. Under our land system, field notes and surveys that are valid, at the furthest, confer on their owners no more than inchoate rights to land, and being merely incipient rights, are clearly under the

legislative control of the State.   This doctrine is incontrovertibly established by numerous decisions.   In one of the earlier cases this court held that, "as an incident to the fee being in the government, it has the right to attach such terms, and impose such regulations as may be deemed most consistent with sound policy; that this has been the uniform construction given to the power of the Legislature over all inchoate and imperfect claims to land." (See League v. DeYoung, 2 Tex., 500; Hughes v. Lane, 6 Tex., 292; Peck v. Moody, 23 Tex., 94; Hosmer v. DeYoung, 1 Tex., 769; Hart v. Gibbons, 14 Tex., 215; Hamilton v. Avery, 20 Tex., 634.)

We will dispose of this issue, for we feel that we would be asking too much of this court were we to attempt to argue it further; for as we remarked in the outset, the question as to whether or not "all field notes" should be returned to the General Land Office, as required by the act of the tenth of February, 1852, is not an open one.   This court has several times passed on this identical issue, and the unanimous opinion of the court each time has been in favor of the appellees.   See Stewart v. Lapsley, 11 Texas, 42, in which this court held "that the field notes of the survey of all lands located and surveyed before the passage of the act, must be returned to and filed in the General Land Office on or before the thirty-first day of August, A. D. 1853.   See Hart v. Gibbons, 14 Texas, 213 ; Upshur v. Pace, 15 Texas, 531.)

Then, did the patent which Commissioner White issued to Milam county on the tenth of October, 1860, confer on her any right to the league of land in controversy?   None whatever.   It issued contrary to law, on field notes that were null and void, and it therefore is itself a nulity.

The law is that " the issuing of a patent is a ministerial act, and must be performed according to law.   If it issues against law it is void, and those claiming under it acquire no right." (See State v. Delesdernier, 7 T. R. 109; Russel v. Mason, 1 Texas,

721; Kimmell v. Wheeler, 22 Texas, 84; Sherwood v. Fleming, Austin Term, December, 1860; Stoddard v. Chambers, 2 How., 318, 345; Winter v. Saltmarsh, 18 How., 87; Samssegack v. the United States, 7 Pet., 222; Barwick's case, 3 Coke, 94.)

WALKER, J.—This is an action to try title commenced in the district court of Johnson county, February 21th, 1864.

The land sued for was patented to appellant on the tenth day of October, 1860, and was part of the school lands surveyed and appropriated by her on the twenty-third day of December, 1849.

On the tenth of August, 1852, the Legislature passed an act requiring the field notes of all surveys made prior thereto to be returned to the General Land Office by the thirty-first day of August, 1853.

The appellees claim title as pre-emptors, under the act of August 26, 1856, authorizing the location and sale of the Mississippi and Pacific Railroad reserve, of which the lands in dispute are a part.

The plaintiff claims title under her patent of 1860.

The appellees claim that appellant did not comply with the requirements of the act of February 10, 1852, and therefore was not entitled to the patent for the land. They show that they returned their surveys when made, tendered fifty cents per acre for the land, and demanded title from the State. It appears that the Commissioner of the General Land Office refused to accept their money, and also to issue patents.

The title to the lands was in the State until the tenth day of October, 1860. No statute of limitation could run against the State. Nor could a settler, under the act of August 26, 1856, acquire title by prescription; for three days after the passage of the act under which the defendants made their pre-emptions, the Legislature passed another act (Paschal's Digest, Art. 3470,) which provides that no statute of limitation shall operate to give

title to lands heretofore or hereafter granted for educational pur-
poses. And this act was, in all probability, passed to deter settlers
from settling on school lands, and was in itself a sufficient notice
to put them on inquiry; and at the time they made these pre-
emptions it was their duty to know, and as a matter of fact we
have no doubt they did know that the county had surveyed the·
lands for school purposes, and at all events they are chargeable
with notice from and· after the time when they returned their sur-
veys and applied for patents.

The appellees and the court below also, appear to have concluded
that the plaintiff, by laches in not returning her field notes on or
before the thirty-first day of August, 1853, had lost her right to
have the lands patented as school lands, and that their title under
the pre-emption laws thereby became good.

We think that if the act of February, 1852, applied at all to
the surveys of school lands (which had been granted by public act
of the Legislature), the State only could have taken advantage of
the laches of the appellant, and it was not for third parties to
take advantage of her neglect. The county of Milam was and is
a trustee, holding these lands for the use of the people, and it
would not only be contrary to law, but much against public policy
to allow the interests of the whole community to be prejudiced by
the negligence of the trustees, when the parties seeking the ad-
vantage are chargeable with notice of the trust; and though the
evidence does not positively establish actual notice, prior to their
attempts to obtain the patents from the State, yet we· believe they
had such notice, for the existence of the fact of four leagues of
land being set off and surveyed within the limits of one county
for such a purpose, must in the nature of things have been too
notorious for any intelligent citizen of the county to claim igno-
rance of it; and the appellees are fairly chargeable with construc-
tive notice.

There was error in the court below overruling the motion for a

new trial.   There was error in the charge of the court, and there was error in the court refusing to charge as requested by plaintiffs' counsel.

There is very little dispute about the facts in the case; most of the evidence consists in the muniments of title, as derived by the parties.   The matters to be determined were mainly questions of law; and believing it wholly unnecessary to remand the case for further proceedings, it is therefore considered by the court that the appellant do have and recover from the appellees the land described in the petition, together with all her costs in this and in the district court expended; and that a writ of restitution do issue to the sheriff of Johnson county, commanding him to place the appellant in possession of all of said lands; and that this judgment be certified below for observance.

Reversed and rendered.