FANNIN COUNTY *v.* JOHN L. RIDDLE.

1. SURVEY—SCHOOL LANDS—STATUTES CONSTRUED.—Since the act of January, 1839, (Paschal's Dig., art. 3466,) neither specifies any time within which the field-notes of county school-land surveys shall be returned to the clerk of the County Court, nor declares that the surveys shall be forfeited unless so returned, the failure of the surveyor to make the returns cannot prejudice the rights of the county to the lands for whose benefit the school surveys were made.

2. SURVEY—SCHOOL LANDS—FORFEITURE.—The act of February 10, 1852, (Paschal's Dig., art. 4562,) requiring field-notes of all surveys made previous to the passage of that act to be returned to the general land office on or before the 31st of August, 1853, and declaring that they should be null and void if not so returned, does not apply to surveys made for the benefit of public schools.

3. CONSTITUTIONAL LAW—SCHOOL LANDS.—Under section 8 of article 9 of the Constitution of 1869, the public lands before given to counties for school purposes were under the control of the State through the Legislature, and under that Constitution, as well as the one now in force, the school lands are set apart for a perpetual school fund, and cannot be appropriated to any other purpose.

4. STATUTES CONSTRUED—SCHOOL LANDS.—The school lands being set apart for a particular public use, cannot, by any intendment, be construed to be within the terms of a subsequent legislative act (in which they are not specially mentioned) by which a different appropriation was made.

5. CASES APPROVED.—Kuechler *v.* Wright, 40 Tex., 606; Wilcox *v.* Jackson, 13 Pet., 498; Parish *v.* Weatherford, 19 Tex., 209; Milam County *v.* Robertson, 33 Tex., 306.

ERROR from Cooke. Tried below before the Hon. C. C. Binkley.

March 3, 1873, John L. Riddle, for himself and as agent

for other parties, brought suit in the District Court of Cooke county against the county of Fannin and G. H. Ragsdale, surveyor of said county, to compel the survey of certain entries made by plaintiff upon lands in Cooke county.

The petition charged, in substance, that on April 21, 1872, plaintiff made out, "in the names of the holders" of certain certificates, "locations and files thereof on vacant and unappropriated public land subject to location;" (which he described, and incorporated in the petition a copy of his files;) that he tendered to the surveyor said files and certificates, with reasonable fees, and requested that a correct entry of the same should be made in the surveyor's books; that the surveyor refused to accept the files or certificates or to make an entry of the same in his books; that afterwards, on the 30th of November, 1872, they were received in the office of the surveyor, Ragsdale, who accepted the same and agreed to make an entry thereof in his books; that Ragsdale has refused to make survey of the locations, alleging "that said lands are not subject to location under and by virtue of said certificates, but says the same have already been appropriated by the county of Fannin, in said State, for school purposes, by a survey thereof."

Riddle, in his petition, further alleged, "that if said land was ever surveyed for school purposes for the county of Fannin, said survey has long since been forfeited and annulled by the subsequent withdrawal of the field-notes of said survey from the general land office," if the same ever were returned, "as petitioner is informed and charges the truth to be"; that if the land was ever surveyed as school land, the surveyor did not thereupon return the same, with the field-notes of said survey, to the clerk of the County Court, nor did the clerk of the County Court record the same and forward a transcript thereof to the commissioner of the general land office, nor were said survey and field-notes returned to the clerk of the County Court of Fannin county for record; "that said field-notes, if any there ever were, were not sent

up to the County Court, and were not recorded either in the county of Cooke or county of Fannin; that for years, and up to plaintiff's files, there were not in the general land office any field-notes or evidences of former survey, such as are required by the laws of the State, but, before his location, that the field-notes of the surveys for school land were withdrawn from the general land office, and if ever thereafter returned, the same had been declared forfeited by the Constitution and laws."

The petition closes with a prayer to compel the surveyor to make the survey, for a decree forfeiting any former survey of the lands for school purposes, and for general relief.

At the April Term, 1873, Ragsdale, by Lindsey & Davis, attorneys, filed a general demurrer to petition, and special exceptions.

April 25, 1873, an answer was filed by all the defendants, through F. E. Piner, district attorney, and Lindsey & Davis, denying the allegations of the petition.

April 30, 1873, plaintiff amended his petition, and charged that on December 4, 1872, Jacob Keochler, commissioner of the general land office, in ignorance of petitioner's files and for the information of one Charles I. Evans, who was trying to locate the land for himself, wrote an official letter to said Evans, (which was set forth in full,) in which he states that it appeared from a file in the general land office that the field-notes of the Fannin county school-land survey in Cooke county had not been returned by the 29th day of November, 1872, and gave it as his opinion that the land was forfeited and subject to location; that afterwards, on the 6th of January, 1873, the commissioner, still ignorant of plaintiff's files, wrote to the defendant as follows, viz.: "Making the survey by virtue of the certificate filed by Charles I. Evans on the survey of three leagues in the name of Fannin county school lands, you are not compelled to go on the ground and make a survey, but may adopt the original field-notes; they will be respected at this office, &c.;"—and that notwithstanding all

this information and these instructions, the surveyor still refused to survey the land.

On August 26, 1873, an agreement between the attorneys of plaintiff and Ragsdale was filed, stipulating that "in no event shall defendant George H. Ragsdale be taxed with any of the costs in this suit, and that the costs that would otherwise be taxed against said Ragsdale be taxed against the plaintiff herein, and that judgment be rendered in accordance herewith at the determination of this suit."

On August 25, 1873, a judgment was rendered reciting that the county of Fannin had wholly made default, "and plaintiff and defendant Ragsdale announcing themselves ready for trial, because it appears, by agreement between the parties, that plaintiff pay all costs herein incurred, whereupon said George H. Ragsdale, by his attorney, withdrew his answer herein filed and says nothing in bar of plaintiff's action." The judgment proceeds to declare the surveys for Fannin county null and void and subject to location. Fannin county, in prosecuting a writ of error filed August 30, 1874, assigns error as follows:

*　*　*　"2. The court erred in rendering judgment in favor of said Riddle upon the petition in this cause, the facts therein being insufficient in law.

"3. The court erred in rendering judgment by default against the county of Fannin, there being no answer for said county on file and among the papers of the cause."

The case was dismissed for want of proper service, and again brought up on supplemental petition in error, on which service was had and again a motion to dismiss was made.

In view of the opinion, it is unnecessary to notice motions to dismiss, which were elaborately argued.

*Walton, Green & Hill* and *Throckmorton & Brown,* for plaintiff in error.

I. The petition is totally defective, and will not authorize a judgment to be pronounced thereon.

It is incumbent upon a person seeking the extraordinary aid of a mandamus to set up specifically in his petition or application to the court for the writ all the facts which, if true, would be necessary to entitle him to the relief sought, and the relator should set forth in the petition all the facts on which he relies for the relief sought. These should be stated so distinctly and clearly that the respondent may either admit or deny them, so that an issue may be framed on the facts alleged as the foundation to the relator's claim to relief. (High's Ex. Legal Rem., sec. 450; Houston Tap and Brazoria Railroad Co. *v.* Randolph, 24 Tex., 333; Cullem *v.* Latimer, 4 Tex., 331; Arberry *v.* Beavers, 6 Tex., 473–475; Winder *v.* Williams, 23 Tex., 603; The State *v.* Everett, 52 Mo., 94.)

II. This suit, however, was, in effect, a suit against the State.

By section 8 of article 9 of the Constitution of 1870, it is provided: "The public lands heretofore given to counties shall be under the control of the Legislature, and may be sold under such regulations as the Legislature may prescribe; and in such case the proceeds of the same shall be added to the public school fund." What the particular facts as to the appropriation of this land by the county of Fannin may be, we have not been permitted by the plaintiff to know. He does not set them forth in his petition, as he was required to do. There is enough, however, leaking out of the petition for us to see that the field-notes were in the general land office at one time and out of the land office at another time. One thing is certain, that the land was attempted to be appropriated as public school land by the county of Fannin, and that it was, by the Constitution of 1870, under the special charge of the State in its corporate capacity, and we think, under the views expressed by Presiding Justice Evans in Kuechler *v.* Wright, 40 Tex., 605, this property would be reserved from entry. (Hosner *v.* De Young, 1 Tex., 767; League *v.* De Young, 2 Tex., 500; Roan *v.* Raymond, 15 Tex.,

85; Houston Tap and Brazoria Railroad Co. v. Randolph, 24 Tex., 333.)

The rules in respect to the appropriation of land by counties as school lands are essentially different from those governing ordinary appropriations. (Milam County v. Robertson, 33 Tex., 366.)

*W. J. Sparks* and *Jackson & Jackson,* for the defendant in error.—The petition sets forth a cause of action by full and specific allegations of (1) the plaintiff's right to locate certain valid land certificates on certain vacant public domain; (2) of his performance of every step necessary to such an appropriation of the land; (3) of the refusal of the defendant Ragsdale, county surveyor, to accept the files and otherwise perform his duties in the premises, based upon the pretext that the land was part of the Fannin county school lands; (4) of the falsity of such pretense. Ragsdale, the surveyor, and the county of Fannin were made the defendants, and were duly cited.

The ground taken by the plaintiff in error is wholly devoted to a discussion of the petition as a suit for a mandamus. The fact that no mandamus was adjudged is a full answer to this ground.

The plaintiff in error insists that this suit "was, in effect, a suit against the State." To this we reply, (1) that nothing in the petition or other proceedings so purports or indicates; (2) that the State has no interest in resisting the location of her valid land certificates upon her vacant public domain; (3) that the State is not the owner of the school lands of the counties, nor interested in a controversy between a locator and a county in respect to land claimed to belong to a county as her school land, and claimed by the locator to be vacant public domain. (Worley v. The State, 48 Tex., 1.) So that in no possible point of view is this a "suit against the State."

BONNER, ASSOCIATE JUSTICE.—If it be admitted that the

plaintiff on the trial below sustained by competent testimony the allegations upon which it was sought to avoid the validity of the surveys of the school lands made for Fannin county, then the two material questions, which are decisive of this case, are—

1. Were said surveys forfeited if they were not returned to the clerk of the County Court, as required by section 3 of the act of January 26, 1839 ?   (Paschal's Dig., art. 3466.)

2. Were they forfeited if not returned to the general land office on or before the 31st of August, 1853, as required by the first section of the act of February 10, 1852 ?   (Paschal's Dig., art. 4562.)

First.  Section 3 of the act of January 26, 1839, (Paschal's Dig., art. 3466,) provides: "When said lands are surveyed in accordance with this act, the surveyor shall return a correct description of the same, with the field-notes of the survey, to the clerk of the County Court, who shall record same and forward a transcript of the same to the commissioner of the general land office, after it is recorded, with his certificate and the seal of office thereto attached; and when land so surveyed is not situated in the county for which it is surveyed, the description and field-notes shall be recorded in the county where it is surveyed, as well as in the county for which it is surveyed, and forwarded to the land office as above described."

The act does not specify any time within which the surveys shall be returned to the clerk of the County Court, or that they shall be forfeited unless so returned.   We are of opinion that the failure of the surveyor to make such return should not prejudice the rights of the county to the lands which have been surveyed for the benefit of public schools. (Stringer *v.* Lessee of Young, 3 Pet., 339; Taylor *v.* Brown, 5 Cranch, 234.)

Second.  We are also of opinion that the act of February 10, 1852, (Paschal's Dig., art. 4562,) requiring field-notes of all surveys made previously to the passage of the act to be

returned to the general land office on or before the 31st of August, 1853, or they should become null and void, does not apply to surveys made for the benefit of public schools.

It has been the policy of Texas, both as a Republic and as a State, to encourage education by a liberal donation from her magnificent public domain, and to preserve and give direction to the same by judicious legislation. By the above act of January 26, 1839, fifty leagues of land were set apart as a university fund, and each county was entitled to have three leagues surveyed for the benefit of a general system of education. This, by subsequent legislation, was increased to four leagues. (Paschal's Dig., arts. 3468, 3476, 3550.)

So guarded was the State to protect these lands and to place them on a different tenure from those held by individuals, that by the act of August 30, 1856, (Paschal's Dig., art. 3470,) it was provided that no statute of limitations should run in favor of any one who had theretofore settled, or might thereafter settle, upon the same. This salutary provision was subsequently incorporated into the organic law of the State. (Const. 1876, art. 7, sec. 6.)

These lands were intended for the wise purpose of public education, which, by the Constitution of 1876, is declared to be essential to the preservation of the liberties and rights of the people. The counties are the mere trustees to carry out this purpose, and the lands are given to them, not to divest the body politic of their control and benefit, but for the purpose of convenience of designation and distribution. This is evident from the jealous protection and direction which the people have exercised over them in their several organic and legislative enactments. At the time of the institution of this suit, by express provision of the Constitution then in force, the public lands before given to counties were under the control of the State through the Legislature. (Const. 1869, art. 9, sec. 8.)

It is held in Kuechler v. Wright, 40 Tex., 600, that the alternate or even-numbered sections of land reserved for

the use of the State by the act incorporating the Memphis, El Paso and Pacific Railroad Company, and which by section 3 of article 10 of the Constitution of 1866 were set apart for a perpetual school fund, had thereby been placed beyond the power of the Legislature to divert to any other purpose. A similar provision was made by section 6 of article 9 of the Constitution of 1869, in force at the date of the institution of this suit, and by section 2 of article 7 of the Constitution of 1876, now in force.

Even had the Legislature the power to thus divert them, we do not think, unless there had been express words or necessary implication to that effect, that the State could have intended by the above act of February 10, 1852, to have declared, by reason of the negligence of her own agents, that as vacant and belonging again to her public domain which she had long before set apart for one of the most important purposes for which it was her settled policy that this very domain should be used, and to which one-half of the same, under her present Constitution, is unreservedly dedicated.

The appropriation of the school lands was made by direct grant of the government, the highest character of title. They were set apart to a particular use, and would not by any intendment be construed to have been within the terms of a subsequent act by which a different appropriation was made. (Kuechler *v.* Wright, 40 Tex., 606; Wilcox *v.* Jackson, 13 Pet., 498.)

It is believed that a very different rule should prevail in a case of this character from that which would obtain between individuals, and that the reasons which prompted the passage of the act in question did not apply to the lands thus held in trust for the people of the State for the use and benefit of public schools.

In the case of Parish *v.* Weatherford, 19 Tex., 209, it was decided that the act of February 10, 1852, (Paschal's Dig., art. 4568,) which required surveys to be returned within twelve months, did not apply to preëmption claims. One of

the reasons given was, that the claimant resided upon the land, and this was sufficient to put the locator upon inquiry.

In the case of Milam County *v.* Robertson, 33 Tex., 366, it was held, that the fact that four leagues of school land had been surveyed in a single county, must, in the nature of things, have been sufficiently notorious to be a cogent circumstance of notice to persons making subsequent locations. It was further held, that if the above act of February 10, 1852, had any application to school lands granted to the several counties, the omission of the county to comply with its provisions was a dereliction of which the State alone could take advantage; that it would be not only contrary to law, but much against public policy, to allow the interests of the whole community to be prejudiced by the negligence of the trustees, when the parties seeking the advantage are chargeable with notice of the trust. The record in the case now before the court shows that appellee had such actual notice. The act having been thus construed by this court years ago, we see no reason on principle why we should depart from it.

In our opinion, the act of November 29, 1871, did not embrace a case of legislative grant like the present, but surveys made by virtue of certificates, bounty warrants, and scrip.

As the plaintiff does not set up a cause of action which would be good on general demurrer, or on motion in arrest of judgment, the judgment of the court below is reversed and the cause dismissed.

REVERSED AND DISMISSED.

Chief Justice MOORE dissented from the views expressed in this opinion.